IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID FUNA, MICHAEL FERRARO, EUGENE L. ALLEGRE, JEROME L. STRITTMATTER and ROBERT MAY, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 07-1743 |
| v. | ) ) | |
| PEPPERIDGE FARM, INC., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

CONTI, District Judge.

On November 30, 2007, plaintiffs David Funa ("Funa"), Michael Ferraro ("Ferraro"), Eugene L. Allegre ("Allegre"), Jerome L. Strittmatter ("Strittmatter"), and Robert May ("May," together with Funa, Ferarro, Allegre, and Strittmatter, collectively, "plaintiffs," "distributors" or "consignees") commenced this lawsuit in the Court of Common Pleas of Allegheny County, Pennsylvania, by filing a complaint. (See Notice of Removal (ECF No. 1). On December 21, 2007, the case was removed to the United States District Court for the Western District of Pennsylvania. (Id.) Pending before the court is a motion for summary judgment (ECF No. 43) filed on April 1, 2010 by defendant Pepperidge Farm, Inc. ("Pepperidge Farm," the "Bakery," or "defendant"). Pepperidge Farm's motion requests the court grant summary judgment with respect to plaintiffs' claims for breach of contract under Pennsylvania law (count 1), breach of the implied covenant of good faith and fair dealing under Pennsylvania law (count 2), and injunctive relief (count 5).[1]

---

[1] The parties stipulated to the dismissal of counts 3, 4, and 6. (See ECF Nos. 34 and 37.)

After considering Pepperidge Farm's motion for summary judgment, plaintiffs' brief in opposition (ECF No. 48), the joint concise statement of facts ("J.S.") (ECF No. 59), and the parties' other submissions, Pepperidge Farm's motion will be granted in part and denied in part for the reasons set forth herein.

## I. Factual background

### A. The consignment agreements

Plaintiffs entered into multiple consignment agreements with Pepperidge Farm on several occasions between 1976 and 2003. (J.S. ¶¶ 1-6.) The consignment agreements permit plaintiffs to "distribute Consigned Products to retail stores" within a particular territory, subject to various limitations and exceptions. (J.S. ¶ 7.)[2] All plaintiffs except May continue to operate as "consignees" under their consignment agreements. (J.S. ¶ 6.)

A plaintiff's right to distribute Pepperidge Farm's products in its territory is exclusive under the consignment agreements, "except in connection with temporary sales programs, . . . sales to direct customers," and "retail facilities owned or operated by the Bakery or by any corporation controlled by the Bakery." (Consignment Agreement (ECF No. 45), Tab 3 ¶ 1.) The right of exclusivity under the consignment agreements is subject to a few exceptions not relevant to the issues before this court. (J.S. ¶ 7.)

### B. Distribution activity with respect to chain accounts

All chain accounts, as that term is defined in the consignment agreements, are direct customers of Pepperidge Farm if they request direct billing from Pepperidge Farm. (Id. ¶ 10.)

---

[2] Plaintiffs admit in the complaint, and Pepperidge Farm does not dispute, that Ferraro's consignment agreement is representative of all the consignment agreements in this case. (Compl. (ECF No. 1) ¶ 7.) For purposes of this memorandum opinion, the court will refer to the terms of Ferraro's consignment agreement as they relate to the various claims, unless otherwise indicated. (See Def.'s Concise Statement (ECF No. 45), Tab 3 ("Consignment Agreement").)

With respect to those "direct" accounts and any other chain account, Pepperidge Farm consigns product to plaintiffs for delivery to retail stores in plaintiffs' territories and plaintiffs solicit sales and deliver consigned products on Pepperidge Farm's behalf at bulletin prices.[3] (Id.) Plaintiffs assert they cannot purchase product they handle in the normal course of business at the lowest price offered by Pepperidge Farm to various accounts. (Id. ¶ 38b.)

In or about 1988, Pepperidge Farm introduced handheld computers that all distributors were required to use. (Id. ¶ 8.) The handheld computers enabled Pepperidge Farm and its distributors to track and manage inventory. (Id.) When plaintiffs deliver Pepperidge Farm product to a chain account, plaintiffs use the handheld computer to generate a delivery ticket reflecting the products delivered. (Id. ¶ 11.) Using the information transmitted on the handheld computer, Pepperidge Farm bills directly all chain accounts that have requested direct billing. (Id.) Plaintiffs receive a 20% commission on product sold to chain accounts at bulletin prices. (Id.) Plaintiffs earn the commission regardless whether the chain account receives a discount on the product due to a temporary sales program. (Id. ¶ 12.) In other words, if Pepperidge Farm offers to chain accounts a dollar off the wholesale price reflected in a particular price bulletin in connection with a temporary sales program, Pepperidge Farm will pay plaintiffs a 20% commission on the undiscounted bulletin price. (Id.) Defendant asserts and plaintiffs dispute that distributors have been receiving commissions consistent with this process since at least 1988. (Id. ¶ 13.)

### C. Distribution activity with respect to cash accounts

---

[3] The meaning of the term "bulletin prices," as explained in further detail below, was disputed by the parties. The majority of plaintiffs' disputes in the joint concise statement of facts relates to the use of this term. Plaintiffs contend the term means the lowest possible price of product sold by defendant, while defendant asserts the term should be understood as the wholesale price of product, with the exception of product related to temporary sales programs. (See J.S. ¶ 11.)

Plaintiffs deliver consigned product to "cash accounts" at prices chosen by plaintiffs. (Id. ¶ 14.) To that end, Pepperidge Farm does not set prices plaintiffs charge cash accounts for consigned product. (Id.) A cash account is understood to be any retail store that has a direct billing relationship with a distributor (including plaintiffs) and not with Pepperidge Farm. (Id.) Pepperidge Farm does not bill cash accounts because they are plaintiffs' customers. (Id.) When plaintiffs deliver Pepperidge Farm product to cash accounts, plaintiffs generate a delivery ticket and Pepperidge Farm charges plaintiffs 80% of the bulletin price for each product. (Id. at 15.) Pepperidge Farm contends, and plaintiffs do not dispute, that plaintiffs can charge cash accounts any price they choose subject to the customer's willingness to pay. (Id. ¶ 16.) Plaintiffs, therefore, could realize more than a 20% profit from the sale of product if they charged cash accounts a price in excess of the bulletin price. (Id.) Plaintiffs have been receiving commissions consistent with this process since at least 1988. (Id. ¶ 18.)[4]

### D. Retail prices

Pepperidge Farm does not set retail prices charged for product; rather, Pepperidge Farm may print "suggested retail prices" on products. (Id. ¶¶ 19-20.) Chain accounts, however, have discretion to charge whatever price they deem appropriate; indeed, chain accounts place "shelf tags" or stickers on product in stores that display prices different from Pepperidge Farm's suggested retail prices. (Id. ¶ 20.)

### E. Pepperidge Farm's Pallet Delivery Program and temporary sales program

Some chain accounts, including BJ's, Costco, and Sam's Club (collectively, "club stores"), refuse direct store delivery from plaintiffs; instead, Pepperidge Farm delivers product on pallets to a central or district warehouse designated by the club store. (Id. ¶ 22.) Club stores take product from their central or district warehouses and deliver it to retail stores in a

---

[4] Plaintiffs dispute this fact, but their dispute is limited to receiving commissions based upon bulletin prices.

distributor's territory. (Id.) In plaintiffs' territories specifically, Pepperidge Farm delivered product on pallets only to Sam's Club and Walmart. (Id. ¶ 29.) Under the pallet program, Pepperidge Farm pays distributors 20% commission less a pallet assessment to cover a portion of the palletizing and delivery costs. (Id. ¶ 22.) The current assessment fee is $35.00 for large pallets and $20.00 for small pallets. (Id. ¶ 24.) Plaintiffs allege they do not receive commissions on products sold to Big Lots by Pepperidge Farm, even though that product is not distressed, out of code, or stale. (Id. ¶ 38c-d.) Pepperidge Farm asserts that all product sold to Big Lots is "distressed" product that is not presentable for sale to retail customers and not covered under the consignment agreements. (Geraghty Decl. (ECF No. 56), Ex. 2 ("Grasky Dep.") at 24.)

Pepperidge Farm provides a company-leased warehouse to plaintiffs at no charge. (Id. ¶ 31.) If Pepperidge Farm does not provide a company-leased warehouse, Pepperidge Farm may give a distributor an allowance to cover the cost of maintaining his or her own warehouse to store consigned Pepperidge Farm products. (Id.)

From time to time, chain accounts run promotions, or temporary sales programs, on Pepperidge Farm products sold in their retail stores. (Id. ¶ 23.)[5] With respect to temporary sales programs, Pepperidge Farm delivers products on pallets to the chain account's central or district warehouse for redistribution to retail stores. (Id.) At the insistence of any particular club store or chain account, Pepperidge Farm delivers product via pallet to central or district warehouses, either for temporary sales programs or when a club store refuses direct store delivery. (Id. ¶ 24.) Pepperidge Farm charges chain accounts the same bulletin price regardless whether the product

---

[5] Plaintiffs attempted to dispute that temporary sales programs occur "from time to time" by asserting that Pepperidge Farm maintains a continual promotion program with chain accounts. Plaintiffs allege that while the promotional programs generate higher sales volume at the particular account running a product promotion, other stores in their territory are not able to generate similar volume because those stores maintain higher prices for the same product. (See Pls.' App. (ECF No. 50), Ex. 2 ("Allegre Dep.") at 30-32.; J.S. ¶ 38e.) Plaintiffs, however, did not present evidence of a continual promotion for a specific product. See infra pp. 14-15.

is delivered via direct store delivery or by pallets to a central warehouse. (Id. ¶ 26.) For temporary sales programs, the retail price for a Pepperidge Farm product at one retail store may be lower than the retail price for the same product at a different retail store in the same territory. (Id.)

## *II. Standard of Review*

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1)** *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that

> party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

### *III. Discussion*

The court has jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332. The claims advanced by plaintiffs arise under Pennsylvania law and their claims are as follows: (1) breach of contract under Pennsylvania law; (2) breach of the implied covenant of good faith and fair dealing under Pennsylvania law; and (3) injunctive relief. Because a request for injunctive relief is just that – a request for relief – it is not a *claim* upon which relief can be granted and need not be considered here. See Protocomm Corp. v. Fluent, Inc., No. 93-518, 1994 WL 719674, at *4 (E.D. Pa. Dec. 27, 1994). The court will address the two substantive claims.

### *A. Breach of contract*

In order to pursue a breach of contract claim under Pennsylvania law, a plaintiff must demonstrate "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Assuming plaintiffs met prongs one and three, Pepperidge Farm contends there is no genuine dispute as to any material fact with respect to a breached duty under the consignment agreements.

The court discerns three ways in which plaintiffs allege Pepperidge Farm breached the consignment agreements: (1) plaintiffs must purchase consigned product at a price set by Pepperidge Farm, when they should be permitted to purchase product at the lowest market price Pepperidge Farm offers accounts; (2) temporary sales programs are not temporary but continual; and (3) product sold to Big Lots and Sheetz is not stale or seconds; instead, that product is fit for distribution, and plaintiffs are entitled to commissions for that product. (Pls.' Br. (ECF No. 48) at 1, 3, 10.)[6]

---

[6] Plaintiffs abandoned their other theories for breach of contract raised in their complaint (see Notice of Removal (Complaint) ¶ 13; Pls.' Br. at 14-15) because they did not create a genuine issue of material fact regarding those

*1. Purchase prices for consigned products*

Under the consignment agreements, Pepperidge Farm is obligated to deliver consigned products to plaintiffs at bulletin prices for those products. Plaintiffs contend the term "bulletin prices" should be construed to mean "the lowest price sold to anyone by the Defendant," <u>id.</u> at 1, and that they are entitled to purchase product from Pepperidge Farm at the lowest price available, including discounted or promotional prices. (<u>Id.</u> at 5.) Pepperidge Farm maintains that the term means the "published prices reflected in the Price Bulletin . . . ." (Def.'s Br. (ECF No. 44) at 15.)[7] The court must determine whether the term "bulletin prices" is ambiguous, i.e., susceptible to more than one reasonable interpretation, and whether Pepperidge Farm breached its duty to consign product to plaintiffs at bulletin prices.

"Disputes over the meaning of a given phrase are common in contract disputes" and the "presence of such interpretative ambiguity . . . [goes to] who (the judge or the jury) must decide what the given clause means." <u>American Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 585-86 (3d Cir. 2009). It is the province of the court to interpret a contract and determine, as a matter of law, whether any ambiguous terms exist. <u>American Eagle</u>, 584 F.3d at 587; see <u>Fletcher-Harlee v. Pote Concrete Contractors</u>, 482 F.3d 247, 249 (3d Cir. 2007) (contracts are interpreted in accord with their plain language, and express terms are given greater weight than trade usage). This method "'contributes to the stability and predictability of contractual relations and provides a method of assuring that like cases will be decided alike.'" <u>Id.</u> (quoting <u>Gonzalez v. U.S. Steel Corp.</u>, 398 A.2d 1378, 1385 (Pa. 1979)). Judicial interpretation of contracts "only

---

theories at the summary judgment stage. See <u>GFL Advantage Fund, Ltd. v. Colkitt</u>, 272 F.3d 189, 199 (3d Cir. 2001) (to defeat summary judgment, a nonmovant cannot rest solely on the allegations in the pleadings, but must rely on affidavits, depositions, interrogatories, or admissions). Plaintiffs, therefore, are limited to the three remaining breach of contract theories outlined *supra*.

[7] Defendant supports this assertion by pointing to the declaration of Kyle Jordan ("Jordan"), director of distributor development for Pepperidge Farm, in which copies of certain price bulletins for consigned product are included. (<u>See</u> Jordan Decl. (ECF No. 57), Ex. A at 2; <u>see also</u> Def.'s Reply Br. (ECF No. 58) at 3.)

holds so long as the words of the contract are clear and unambiguous, or the extrinsic evidence is conclusive." Id. If a court determines a particular phrase is ambiguous, "deciding the intent of the parties becomes a question of fact for a jury." Id.; see USX Corporation v. Penn Central Corp., 130 F.3d 562, 566 (3d Cir. 1997) (if the terms are ambiguous, the factfinder must interpret the terms); Ram Constr. Co., Inc. v. Am. States Ins. Co., 749 F.2d 1049, 1052 (3d Cir. 1984) (when an agreement is reduced to a writing, ambiguous terms are interpreted by a jury, unambiguous ones by the court).

"'A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994) (quoting Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986)). If a court determines that a contract's terms are unclear, it may consider extrinsic or parole evidence to resolve the ambiguity. Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 93 (3d Cir. 2001). Pennsylvania law, however, presumes the "four corners" of a writing conveys the parties' intent, and a contract

> is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

Id. (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 603, 614 (3d Cir. 1995)).

The consignment agreements define bulletin prices as "the prices for Consigned Products charged by the Bakery and published from time to time." (Consignment Agreement (Definitions) ¶ (h).) Interpreting the term "bulletin prices" in conjunction with the plain meaning of the consignment agreements, the bulletin price is the published price Pepperidge Farm charged for consigned product – product that plaintiffs would then distribute or deliver to retail

stores. (See Consignment Agreement ¶¶ 1, 3(a).) This is the only reasonable interpretation of the term. It incorporates the term's definition from paragraph (h) of the consignment agreement's definition section, as well as the language used in paragraph 3(a) to describe the purpose of bulletin prices as they relate to consigned product and plaintiffs' duties to deliver that product to retail stores.

The reduced prices Pepperidge Farm offered accounts related to temporary sales programs. There is no evidence that Pepperidge Farm reduced prices on product sold to accounts in connection with any other program. The reduced prices associated with temporary sales programs cannot be "bulletin prices" as that term is understood within the four corners of the consignment agreement. Pepperidge Farm did not *consign product* to plaintiffs in contemplation of temporary sales programs. Tellingly, paragraph one of the consignment agreements provides consignees the exclusive right to distribute consigned product to retail stores in their territory, "*except* in connection with temporary sales programs . . . ." (Consignment Agreement ¶ 1.) Indeed, the record does not contain any evidence demonstrating an instance when plaintiffs purchased consigned product at bulletin prices from Pepperidge Farm for purposes of distributing that product to retail stores in connection with a temporary sales program.[8] Pepperidge Farm reserved the right to conduct temporary sales programs on its own terms

---

[8] Plaintiffs point to the deposition of James Rebenold ("Rebenold") in support of the proposition that, at one time, they were permitted to purchase product at a discounted or promotional price and re-sell the product to chain accounts. (See Pls.' App., Ex. 7 ("Rebenold Dep.") at 54-58; Pls.' Br. at 5-9.) It is unclear from the deposition testimony whether that practice related to temporary sales programs. It is clear, however, that the practice ended around the time Pepperidge Farm introduced a new computer system. (Rebenold Dep. at 59.) While the practice may have occurred, it is not contemplated by the terms of the consignment agreements. Paragraph 1 of the consignment agreements expressly provides Pepperidge Farm with the authority to sell or deliver products to retail stores in connection with temporary sales programs. The Bakery was not obligated to offer plaintiffs product at the promotional rate in connection with those programs. Notably, the definition of bulletin prices in the consignment agreement gives Pepperidge Farm the discretion to charge prices for consigned product that it publishes from time to time. In other words, Pepperidge Farm retained the right to charge plaintiffs prices for consigned product that it set prior to the application of any discounts or promotions. Paragraph 24 provides the agreement "may not be amended orally or by custom or conduct . . . ." (Consignment Agreement ¶ 24.) The customary practice Rebenold referred to in his deposition regarding plaintiffs' ability to purchase product at a discount has no bearing on the court's interpretation of the term "bulletin prices" as it relates to the other provisions in the contract.

irrespective of the consignment agreements. Pepperidge Farm retained the right to deal directly with retail stores concerning temporary sales programs, and it would serve no purpose to consign product to plaintiffs – at bulletin prices or otherwise – with respect to those programs. (See Def.'s Br. at 15.)

Plaintiffs want to rework the term "bulletin prices" to encompass *any* price, including the lowest price, Pepperidge Farm offered accounts. This argument appears to encompass two situations: (1) the lowest price offered to accounts in conjunction with a temporary sales program; and (2) retail prices for product on the shelves of particular retail stores. As discussed *supra*, the term bulletin prices does not apply to prices offered to accounts with respect to temporary sales programs because product sold for those programs is not *consigned* to plaintiffs – those prices would not fall under the definition of bulletin prices in paragraph (h) of the definitions provision of the consignment agreements.

Under the second scenario, the consignment agreements do not obligate Pepperidge Farm to consign products to plaintiffs at the lowest retail price being offered in a retail store because Pepperidge Farm cannot control those prices. The record evidence supports this conclusion because Pepperidge Farm did not have any authority to set retail prices and only posted a "suggested retail price" on products – retail stores had the authority to charge whatever price they deemed appropriate. It would be unreasonable to hold Pepperidge Farm accountable to sell plaintiffs products based upon a price that Pepperidge Farm could not set. Under the terms of the consignment agreements, the only reasonable interpretation of the term "bulletin prices" is the price set by Pepperidge Farm for product consigned to plaintiffs for resale and delivery to retail stores in plaintiffs' territories. Bulletin prices exclude prices offered for the purpose of a temporary sales program and prices retail stores chose to offer consumers at the point of

purchase – those prices are outside the scope of the consignment agreement. The term "bulletin prices" is not ambiguous. Plaintiffs did not raise a genuine dispute of material fact with respect to the term "bulletin prices," and summary judgment must be granted in favor of defendant on plaintiffs' breach of contract claim regarding this issue.

*2. Temporary sales programs*

Plaintiffs assert that Pepperidge Farm maintains a continuous promotion program with chain accounts which reduces sales volume at other accounts in their territories that charge higher prices for the same products. Pepperidge Farm responds that plaintiffs raise this issue for the first time at the summary judgment stage, and that temporary sales programs are not continuous, but run from time to time on a temporary or intermittent basis.

As a preliminary matter, the court reiterates the concept that Pepperidge Farm retained the right under the consignment agreements to sell or deliver its product to retail stores in connection with temporary sales programs. The relevant portion of the consignment agreement provides as follows:

> The Consignee will have the exclusive right to distribute Consigned Products to retail stores within the territory, and the Bakery will not sell or deliver or authorize any others to sell or deliver the same products to retail stores within the territory except in connection with temporary sales programs and except for sales to direct customers pursuant to orders solicited by Consignee under Paragraph 3(b); provided, however, that the Bakery will have the exclusive right to distribute Consigned Products to retail facilities owned or operated by the Bakery or by any corporation controlled by the Bakery. The terms of this paragraph are subject, however, to the terms of Paragraphs 6, 7 and 9.

(Consignment Agreement ¶ 1.) The contours of temporary sales programs are not delineated in the consignment agreements. Assuming *arguendo* that plaintiffs can challenge Pepperidge Farm's handling of its temporary sales programs, there is no genuine dispute with respect to any

13

material fact, and no reasonable jury could conclude that Pepperidge Farm's temporary sales programs are continuous.

When discussing temporary sales programs, Allegre testified that "in some cases they're temporary, but temporary tends to be permanent, because they just roll from one to another." (Pls.' Appx., Ex. 2 ("Allegre Dep."), at 31-32.) Allegre qualified that statement when he agreed that the sales programs run at different times of the year for different customers. (Id. at 40.) May stated that Pepperidge Farm "hides behind" the temporary sales program because the program "goes year in, year out, without stopping." (Pls.' Appx., Ex. 4 ("May Dep."), at 41.) John McGuire, a deposition witness called by plaintiffs, testified that the sales programs could last for a three-month period, but "were typically much shorter than that." (Pls.' Appx., Ex. 6 ("McGuire Dep."), at 14.) He explained that a sales program discount on a particular product would not last continually for a twelve-month period. (Geraghty Decl., Ex. 1 ("McGuire Dep.") at 18.) Michael Grasky ("Grasky"), another deposition witness for plaintiffs, stated that promotional calendars related to sales programs would come out on a quarterly basis and different products would be promoted at different times during a particular quarter (i.e., a thirteen-week time period). (Pls.' Appx., Ex. 9 ("Grasky Dep."), at 11-12.) Plaintiffs also deposed Hoa Khuu, who testified that "there is not always a promotion going on" at her Giant Eagle. (Geraghty Decl., Ex. 3 ("Khuu Dep.") at 22.)

Viewing the deposition testimony collectively, the court determines that, while temporary sales programs for certain products may overlap with programs for other products at the same retail store, there is no record evidence to suggest that temporary sales programs for any particular product were unending. Paragraph 1 of the consignment agreements provides a basis for concluding that a temporary sales program is a program for a product – not a temporary sales

program for all consigned products.  A product at a retail store may be subject to a sales program for a three-month period, or on a quarterly basis, but those programs did not last for a year at a time for all consigned products.  May's testimony that the programs go for years at a time does not refute this conclusion.  There may be temporary sales programs year after year, but those programs are for different products and in different retail stores.  There is no genuine dispute of material fact with respect to the temporary nature of Pepperidge Farm's sales programs, and summary judgment must be granted in favor of defendant on plaintiffs' breach of contract claim regarding this issue.

### *3. Product sold to Big Lots and Sheetz*

Plaintiffs argue Pepperidge Farm violated the consignment agreements by selling product directly to Big Lots and Sheetz and that they are entitled to commissions for product sold to those accounts.  (Pls.' Br. at 15.)  Pepperidge Farm responds that all product sold to Big Lots is stale or discontinued, and plaintiffs have no right to commissions on that product.  Additionally, Pepperidge Farm contends Sheetz refused direct store delivery of product, and that, under the consignment agreements, Pepperidge Farm is obligated to deliver its products directly to Sheetz's central warehouse.  (Def.'s Br. at 5.)

### *a. Big Lots*

With respect to product sold to Big Lots, there is a genuine dispute of material fact concerning whether that product is stale or seconds, as those terms are defined in the consignment agreements.  Stale products "refers to Consigned Products whose shelf life has expired, as determined by the Bakery's stale policy existing from time to time."  (Consignment Agreement (Definitions) ¶ (e).)  The term "seconds" is defined as "Consigned Products which do not meet the high standards required by the Bakery for distribution in the ordinary manner and

thus are deemed by the Bakery, in its sole discretion, to be unsuitable for that purpose." (Id. ¶ (f).)

The definitions of those terms give Pepperidge Farm discretion to determine whether consigned products are stale or seconds. Plaintiffs, however, rely upon Allegre's deposition testimony, as well as a declaration of May, to support their contention that the products Pepperidge Farm sells to Big Lots are *not* stale or seconds. Allegre stated that, while Big Lots carries "firsts" and not "seconds," the products "might be what [Big Lots] consider short coded," although he had "seen in code products in Big Lots stores."[9] (Allegre Dep. at 20.) May asserted in his declaration that he visited Big Lots stores on numerous occasions and observed Pepperidge Farm products stocked on Big Lots shelves that were not stale and in code. (Pls.' Appx., Ex. 15 ("May Decl.") ¶¶ 2-3.) Specifically, May recounted one occasion on July 1, 2009, when he visited a Big Lots store in West Mifflin, Pennsylvania, and observed that all Pepperidge Farm product on the shelves were current and not discontinued and that he was able to purchase that product. (Id. ¶ 4.)

Pepperidge Farm responds that all Pepperidge Farm product sold to Big Lots stores are stale or seconds under the consignment agreements and plaintiffs' request for commissions on those products appears for the first time in their summary judgment submissions. Specifically, Pepperidge Farm relies upon the deposition testimony of Grasky and James Ruddy ("Ruddy") to demonstrate that its product sold to Big Lots is stale or seconds. (See Def.'s Br. at 5.) For example, Grasky testified that distributors are not paid a commission on product sold to Big Lots because it is distressed product, or product "[n]ot presentable for sale to retail customers," and is "not covered under the contract." (Geraghty Decl., Grasky Dep. at 23-24.) Ruddy, a deposition

---

[9] While the consignment agreements do not explicitly define "in code" products, the agreements contain language which suggests "overcode" items are "over-age" or "stale" products. (See Consignment Agreement at 13.)

witness called by plaintiffs, stated that Pepperidge Farm sells stale or discontinued products to Big Lots, unless distributors signed an addendum to their consignment agreements which gave "them the rights to be paid commission on products delivered to those stores." (Geraghty Decl., Ex. 4 ("Ruddy Dep.") at 12-13.)[10]

There is a genuine dispute of material fact concerning whether Pepperidge Farm products sold to Big Lots in plaintiffs' territories are stale or seconds. If the products are stale or seconds, they would not be considered "consigned product" under the consignment agreements, and plaintiffs would have no right to commissions on those products. (See Consignment Agreement (Definitions) ¶ (d).) If the products are not stale or seconds, Pepperidge Farm could be in violation of the consignment agreements by interfering with plaintiffs' exclusive right to sell and distribute consigned product to retail stores in their territories. (See id. ¶ 1.) Because a reasonable jury must determine whether any or all of Pepperidge Farm products in Big Lots stores are stale or seconds, summary judgment must be denied with respect to plaintiffs' breach of contract claim regarding that issue.

*b. Sheetz*

Plaintiffs mention in passing in their brief in opposition to summary judgment that Pepperidge Farm violated the consignment agreements by delivering product to Sheetz. Pepperidge Farm responds that, under the agreements, the Bakery is required to deliver product to a central warehouse when a chain account refuses direct store delivery, and that Sheetz refused direct store delivery.

---

[10] All plaintiffs except Strittmatter signed an addendum permitting them to remove stale product from retail stores and resell that product to stores dealing exclusively in stale product. (See Def.'s Concise Statement, Tabs 1-5.) According to Ruddy, signing the addendum permitted plaintiffs to receive commissions for stale product they sold to Big Lots. The parties do not discuss the addendums or their effect on plaintiffs' claim for lost commissions on product sold to Big Lots.

Plaintiffs' exclusive rights under the consignment agreements are subject to the limitations in paragraph 9, which provides:

> [T]he Consignee will not . . . make deliveries of Consigned Products to any chain via a central or district warehouse or in any manner other than directly to its retail stores. If, despite the best efforts of the Consignee and the Bakery to obtain permission from any chain to make deliveries directly to its retail stores, such chain refuses to handle Consigned Products except via warehouse deliveries, the Bakery shall have the right in its discretion to sell and deliver its products directly to such chain for its own account via warehouse deliveries as long as such refusal remains in effect.

(Consignment Agreement ¶ 9.)

In June 2004, Pepperidge Farm sent letters to distributors informing them that "Sheetz Incorporated recently instructed Pepperidge Farm to commence delivery of products to its company-owned stores via a centralized warehouse distribution system," and that Sheetz "will not accept store-door deliveries from our independent distributors." (Jordan Decl., Ex. B at 2 (citing paragraph 9 of the consignment agreements).) Allegre corroborated the theme of those letters in his deposition testimony, acknowledging individuals at a Pepperidge Farm meeting were told Sheetz was "getting product from the warehouse" and that Pepperidge Farm was the party responsible for delivering that product. (Allegre Dep. at 19-20.) Allegre stated that, as of September 25, 2008, it was his understanding that Sheetz no longer sold Pepperidge Farm product in its stores. (Id. at 18.)

There is no dispute that Pepperidge Farm has the right under the consignment agreements to distribute its product to central or district warehouses when a retail store refuses direct delivery from distributors. There also is no dispute that, in this case, Sheetz refused direct store delivery of Pepperidge Farm product from plaintiffs, thereby enabling Pepperidge Farm to continue product distribution to those stores under paragraph 9 of the consignment agreement.

Because paragraph 9 precludes plaintiffs from distributing product to Sheetz in this instance, there is no genuine dispute as to any material fact with respect to that issue, and summary judgment must be granted in favor of Pepperidge Farm on this issue.

### *B. Breach of the implied covenant of good faith and fair dealing*

Plaintiffs concede in their brief in opposition to Pepperidge Farm's motion for summary judgment that "an independent action for breach of the implied Covenant of Good Faith and Fair Dealing does not lie here . . . ." (Pls.' Br. at 15.) Specifically, plaintiffs request the court view their breach of the covenant of good faith claim in conjunction with their breach of contract claim. (Id.) Under Pennsylvania law, "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.'" Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91-91 (3d Cir. 2000) (quoting Parkway Garage, Inc. v. City of Phila., 5 F.3d 685, 701-02 (3d Cir. 1993), *overruled on other grounds by* UA Theatre Circuit v. Twp. of Warrington, 316 F.3d 392, 400 (3d Cir. 2003)). Because plaintiffs' allegations in their breach of contract claim are identical to their allegations of bad faith, no reasonable jury could conclude that plaintiffs have raised a genuine dispute of a material fact with respect to their breach of the covenant of good faith claim, and that independent claim will not survive summary judgment.

### *IV. Conclusion*

As set forth above, summary judgment is granted in favor of Pepperidge Farm with respect to all plaintiffs' claims except their breach of contract claim implicating product sold to Big Lots. An appropriate order will follow.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: March 11, 2011